IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANITA HERNANDEZ, | No. C 11-2692 CW |
| Plaintiff, | ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |
| _____/ | |

Plaintiff Anita Hernandez, now deceased and substituted by Yvonne A. Poe, moves for summary judgment or, in the alternative, for remand in this social security appeal on the grounds that the administrative law judge (ALJ) failed to develop the record in regard to her physical and mental impairments, failed to provide adequate reasons for rejecting her testimony regarding the severity of her symptoms, and failed to follow the regulations governing evaluation of mental impairments. Defendant Michael J. Astrue in his capacity as Commissioner of the Social Security Administration (SSA) opposes Plaintiff's motion and cross-moves for summary judgment. Plaintiff filed a reply. Having considered the papers filed by the parties and the relevant legal authority, the Court denies Plaintiff's motion for summary judgment or for remand, and grants the Commissioner's cross-motion for summary judgment.

BACKGROUND

In August 2008, Plaintiff filed applications for disability benefits and supplemental security income pursuant to Titles II

and XVI of the Social Security Act, alleging that she became disabled on May 10, 2001, because of carpal tunnel syndrome and arthritis. AR 249. The applications were denied initially on November 4, 2008, upon reconsideration on February 4, 2009, and, after a hearing held on March 22, 2010, by an ALJ in a decision dated May 4, 2010. The ALJ's denial of benefits became the final decision of the Commissioner when the Appeals Council denied review.

Plaintiff was born on February 22, 1962. At the time of the ALJ decision, Plaintiff was forty-eight years old. She did not complete high school but graduated from an administrative medical assistant college program. AR 59, 69. Plaintiff had past relevant work as a housekeeper, retail sales clerk and assembler.

In her application for disability benefits and supplemental security income, Plaintiff reported that carpal tunnel syndrome and arthritis interfered with her ability to work as of May 10, 2001. AR 249. Plaintiff also filed a claim for workers' compensation arising from repetitive stress injury she sustained in the course of her employment as an assembler. AR 320. Plaintiff settled her workers' compensation claim by compromise and release dated November 2, 2005. AR 314-19.

On May 10, 2001, Plaintiff was treated by Dr. Zaharoff who noted that Plaintiff had been in a motor vehicle accident at the age of two in which she hit the dashboard and broke her legs and one arm and had had back problems ever since. AR 449-50, 523-24. Dr. Zaharoff determined that Plaintiff required elbow supports and that she could not reach above the shoulders and could perform repetitive hand motions "frequently," which is less restrictive

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

than the categories of "occasionally" or "not at all," but is more restrictive than "no restrictions."  AR 522.  Dr. Zaharoff also noted that Plaintiff should not perform mandrel work or forceful pinching or grasping.  AR 522-24.  Dr. Zaharoff saw Plaintiff again on May 23, 2001, and continued to limit Plaintiff to no reaching above the shoulders, frequent repetitive hand motions, no mandrel work and no forceful grasping.  AR 518.  Dr. Zaharoff diagnosed Plaintiff with carpal tunnel syndrome and cervical dysfunction, also referred to as Double Crush Syndrome.  AR 383, 442, 516.

On June 7, 2001, Dr. Vidaurri examined Plaintiff and authorized moderate duty through June 29, 2001, but restricted use of the left hand to perform occasional repetitive hand motions and no repetitive firm grasping.  AR 446.  On June 8, 2001, Dr. Vidaurri also diagnosed Plaintiff with CTS/cervical dysfunction (Double Crush Syndrome) and noted that the carpal tunnel symptoms were "very atypical."  AR 514-15.  Dr. Vidaurri conducted a Jamar grip strength test showing Right: 45, 40, 35 and Left: 20, 15, 35.[1]  AR 447, 514.  On July 2, 2001, Dr. Zaharoff noted that a nerve conduction study revealed bilateral CTS and prohibited Plaintiff from performing mandrel work, but he authorized work for eight hours per day and forty hours per week.  AR 440.  Dr.

---

[1]  These test results appear to refer to readings taken from a Jamar® dynamometer which measures hand grip strength.  See Amaral, et al., Comparison of Three Hand Dynamometers in Relation to the Accuracy and Precision of the Measurements (June 2012), http://www.ncbi.nlm.nih.gov/pubmed/22801514.  Plaintiff does not point to any evidence in the record attributing particular significance to her Jamar test results.

Zaharoff also noted that Plaintiff missed her scheduled physical therapy on June 21, 2001, and was unable to cancel her appointment.  AR 439.

On August 24, 2001, Dr. Coomber examined Plaintiff to prepare disability paperwork and noted a trace of popping as she moved her left shoulder.  AR 357-59.  Although Dr. Coomber did not formally measure Plaintiff's range of motion, he observed that it was not grossly, severely limited.  AR 358.

On October 18, 2001, Dr. Gunderson conducted an orthopaedic evaluation of Plaintiff, noting that the Jamar grip strength test showed Right: 50, 50, 60 and Left: 40, 35, 40.  AR 437.  Dr. Gunderson reviewed Plaintiff's medical records and prepared a report to address the issue of causation for the workers' compensation claims examiner.  AR 435-38.  Dr. Gunderson recommended that bilateral electrodiagnostic studies be carried out to rule out carpal tunnel syndrome, after which he would submit a supplemental report.  AR 437.

On January 9, 2002, Dr. Kivett examined Plaintiff and noted that a grip strength test showed Right: 15, 16, 22 and Left: 26, 31, 26.  AR 380.  He also noted two two-centimeter scars on Plaintiff's right volar forearm and two scars on the dorsal hand, a four-centimeter scar on the right dorsal mid-forearm, and a one-centimeter burn on the right dorsal first web space, "reported as asensate."  AR 380.  He diagnosed Plaintiff with dynamic symptoms of bilateral carpal tunnel syndrome with positive physical findings without improvement since being off work; bilateral

United States District Court
For the Northern District of California

4

Wartenberg's[2] by history; and repetitive stress injury, bilateral upper extremities.  AR 381.  Dr. Kivett concluded that Plaintiff was subjected to repetitive stress injury for about three years which caused the bilateral carpal tunnel syndrome.  AR 381.  Dr. Kivett noted that, although Plaintiff's obesity may have been a mitigating factor, the fact that her symptoms had not improved since she stopped working and the evidence of a burn in asensate tissue supported a conclusion of profound changes.  AR 381.

On June 27, 2002, Dr. Satow conducted an upper extremity electrodiagnostic study on Plaintiff which revealed evidence of bilateral carpal tunnel syndrome; he categorized the right side as severe and the left side as moderate to moderately severe.  AR 392.

On August 8, 2002, Dr. Kivett opined that Plaintiff's pain, numbness and tingling prevented her from returning to her regular and customary work until September 15, 2002.  AR 410.  An emergency department report indicates that on September 12, 2002, Plaintiff was treated for a possibly infected abdominal surgical wound following a cholecystectomy (gallbladder removal) about three weeks earlier.  AR 341.

On October 31, 2002, Dr. Newton conducted further electrophysiologic studies of Plaintiff's upper extremities and found the results compatible with bilateral carpal tunnel syndrome.  AR 593.  Based on the results of these studies, Dr. Gunderson prepared a supplemental report recommending that

---

[2]  Plaintiff represents that Wartenberg's syndrome is entrapment of the sensory branch of the radial nerve described by Wartenberg in 1932.  Pl.'s Mot. at 5 n.2.

United States District Court
For the Northern District of California

Plaintiff see a surgeon who specializes in carpal tunnel syndrome. AR 591.  In a November 25, 2002, report, Dr. Gunderson further explained that Plaintiff "needs a right carpal tunnel release on the right and should be permanent and stationary approximately three months afterward.  It may then be decided that the left side also needs surgery and again a three month period afterward would make her permanent and stationary." AR 588.  Dr. Gunderson indicated that until Plaintiff had the surgery, he would keep her in night splints.  AR 588.  Dr. Gunderson further opined that, since January 9, 2002, Plaintiff "could have been on modified duty not being engaged in any repetitious hand work."  AR 588.

On January 15, 2003, Plaintiff received authorization for carpal tunnel release surgery.  AR 384.  Dr. Kivett's records indicate that Plaintiff was scheduled for the surgery on February 14, 2003, but the operation was cancelled because Plaintiff did not show up for her scheduled pre-operative visit.  AR 394. Although Plaintiff could not recall why she missed the visit and did not have the surgery, she clarified at the hearing that it was not due to her incarceration which occurred later in 2003.  AR 39-40.

Plaintiff's prison health records, submitted to the Appeals Council after the ALJ's decision, indicate that on June 2, 2003, she was excluded from the developmental disability program on the ground that she received a passing score on a cognitive test.  AR 630.  The prison's mental health interdisciplinary progress notes indicate that from October 6, 2003, to May 21, 2004, Plaintiff reported symptoms of feeling depressed and difficulty sleeping. AR 625-29.  A progress note dated March 9, 2005, indicates that

1  Plaintiff failed to arrive for two psychoeducational group

2  sessions and was referred to her case manager.  AR 624.

3       On May 11, 2005, Dr. Gordon saw Plaintiff for an orthopaedic

4  hand surgery evaluation and noted that Plaintiff had not had any

5  treatment since February 2003.  AR 596.  Dr. Gordon further noted

6  negative results for Tinel's sign and Phalen's sign, both of which

7  are tests for carpal tunnel syndrome.  AR 597.  Dynamometer

8  readings from Plaintiff's grip strength test showed Right: 40, 35,

9  25 and Left: 30, 25, 25.  AR 603.  Dr. Gordon opined that, based

10 on the overall clinical presentation, Plaintiff did not have

11 severe ongoing carpal tunnel syndrome necessitating surgery, but

12 noted, "Considering that she has had two positive

13 electrodiagnostic studies, if there is indeed a deterioration of

14 the clinical condition, an award for future medical treatment to

15 have a carpal tunnel release done in the future would be

16 reasonable."  AR 601.  Dr. Gordon suggested further treatment with

17 conservative supportive measures, anti-inflammatories, analgesics,

18 splinting, advice regarding hand use, a course of therapy up to

19 twelve visits a year over the next two years, and other supportive

20 conservative care.  AR 601.  Dr. Gordon restricted Plaintiff from

21 activities that require lifting more than ten pounds on a

22 repetitive basis or fifteen pounds intermittently.  AR 601.  He

23 allowed Plaintiff to do repetitive gripping or manipulative

24 activities for no more than half an hour at a time, up to three

25 hours interspersed throughout an eight-hour work shift.  AR 601.

26      On October 26, 2006, Dr. Stanton examined Plaintiff and found

27 numbness down the arm and into wrist, and stiff joints, especially

28 at shoulder and elbow, and prescribed wrist braces and ibuprofen.

**United States District Court**
For the Northern District of California

AR 354-55.  On November 9, 2006, Dr. Berg examined Plaintiff and indicated that Plaintiff had stiffness at the shoulders and fingers, that wrist splints help with sleep, and that Plaintiff's right wrist was numb, noting transient paresthesias[3] in all fingers.  AR 352-53.  On July 9, 2007, Dr. Riley limited Plaintiff to typing forty words per minute, with a notation that she was under Dr. Langley's care.  AR 349.

Plaintiff filed an application for disability benefits on August 12, 2008.  AR 234-37.  On September 2, 2008, Dr. Berg treated Plaintiff at Sonoma County Indian Health for carpal tunnel syndrome, pain in wrists, and right shoulder pain.  AR 344. Plaintiff requested pain medication stronger than Naprosyn and was prescribed Celebrex.  AR 344.

On October 28, 2008, Dr. Fieser examined Plaintiff for an orthopedic evaluation.  AR 361.  Dr. Fieser reported negative Tinel's and Phalen's signs bilaterally and found that flexion and extension of the shoulders, elbows and wrists were all 5/5 and symmetric, as was Plaintiff's grip strength.  AR 363.  Dr. Fieser noted with respect to home tasks that she could stand at the sink and wash dishes, load the washer and dryer, vacuum, perform light dusting, lift a gallon of milk and lift and carry up to five pounds.  AR 361.  Dr. Fieser noted Plaintiff's history of chronic bilateral hand and wrist pain with a history of possible carpal tunnel syndrome with no objective evidence on examination.  AR 364.  Dr. Fieser's functional assessment opined that Plaintiff

---

[3]  Paresthesia is defined as a spontaneous abnormal, usually nonpainful, sensation such as burning or pricking.  See Stedman's Medical Dictionary, 28th ed. (Lippincott Williams & Wilkins 2006).

could stand and walk, or sit, in an eight-hour workday without limitations and with normal breaks, had no restrictions on the amount of weight that Plaintiff could lift and carry, and had no postural limitations or specific manipulative limitations.  AR 364.

On October 16, 2008, Dr. Berg treated Plaintiff, who reported that she had a persistent cough, and prescribed albuterol and doxycycline.  AR 458.  On October 17, 2008, Dr. Coomber noted an abnormal chest x-ray taken by Dr. Munroe showing a five-centimeter lingular mass.  AR 462.  On October 21, 2008, Plaintiff saw Dr. Berg who prescribed her additional medications.  AR 464. On November 12, 2008, Dr. Kruusmagi treated Plaintiff for management of pneumonia, which Plaintiff had had for over two months, and tested her for tuberculosis, for which she was negative.  AR 469, 476, 604.

On December 5, 2008, Plaintiff was seen by Dr. Steele who noted that she had been sick due to respiratory infection six times in the last year.  AR 474.  Dr. Steele noted that a CT scan of the chest from earlier that month showed a persistent lung abscess and started Plaintiff on a course of Augmentin antibiotics.  AR 475.

On December 30, 2008, in support of her application for disability benefits, Plaintiff stated that her sleep was affected but was not sure which of her many different medications was affecting her sleep.  AR 281.  Plaintiff also indicated that she was taking prozac for depression, amoxicillin for her lungs and naprasen for pain, all of which caused upset stomach.  AR 292.

United States District Court
For the Northern District of California

In her application for disability benefits, Plaintiff stated that, while she was in school, she had attention deficit disorder. AR 285.  When asked at the March 22, 2010, hearing about having ADD, Plaintiff indicated that her friend first suggested that she had ADD because she interrupts people.  AR 68.  Plaintiff's counsel clarified that Plaintiff wasn't sure if she had an ADD issue or learning disorder and asked the ALJ to order a consultative examination (CE) by a psychologist to evaluate Plaintiff's learning disorder.  AR 70-71, 78.  The ALJ declined to order a CE, but stated that he would hold the record open for twenty days to allow Plaintiff to submit recent treatment notes or pharmacy notes.  AR 78-79.

Plaintiff submitted evidence to the ALJ on March 19, 2010. AR 328-31.  The ALJ conducted a hearing on March 22, 2010, at which Plaintiff was represented by a non-attorney representative. Plaintiff testified at the hearing, as did her friend, Alex Andrada.  AR 13.  A vocational expert also appeared at the hearing.  AR 10.  The ALJ issued a decision dated May 4, 2010, denying Plaintiff's application for disability benefits and supplemental security income.  AR 7.

Plaintiff appealed the ALJ's denial.  AR 184.  On October 20, 2010, Plaintiff submitted new psychological records from her treating psychologist, Dr. Steinberg, and her prison medical records dated June 2, 2003, to March 9, 2005, which the Appeals Council made part of the record.  AR 5, 615.  Based on treatment sessions with Plaintiff on July 20, 2010, August 3, 2010, August 17, 2010, and September 16, 2010, Dr. Steinberg opined that Plaintiff had major depression, as substantiated by the symptoms

of dysphoric mood and loss of interest in almost all usual activities, sleep disturbance, psychomotor agitation, loss of energy and fatigue, feelings of worthlessness, impaired concentration and indecisiveness, and recurring thoughts of death. AR 617-21.

On March 31, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  AR 1-3.  Plaintiff filed this action for judicial review on June 3, 2011.  The parties' cross-motions for summary judgment are submitted on the papers.

After Plaintiff's reply brief was filed, her attorney notified the Court that Plaintiff passed away on March 3, 2012. Pursuant to the motion for substitution by Yvonne A. Poe, Plaintiff's daughter and the executor of Plaintiff's estate, the Court entered an order substituting Ms. Poe for Plaintiff in this action on June 4, 2012.

LEGAL STANDARD

A court may set aside the Commissioner's denial of disability benefits only when his findings are based on legal error or are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  The ALJ's decision is reviewed for harmless error. Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1054-56 (9th Cir. 2006) (applying harmless error standard of review in the social security context).  Substantial evidence is defined as "more than a mere scintilla but less than a preponderance." Tackett, 180 F.3d at 1098.  The court must consider the entire record, weighing

both the evidence that supports and that which contradicts the

Commissioner's conclusion.   Id.

    Even when a decision is supported by substantial evidence in

the record, it "should be set aside if the proper legal standards

were not applied in weighing the evidence and making the

decision."   Benitez v. Califano, 573 F.2d 653, 655 (9th Cir. 1978)

(citing Flake v. Gardner, 399 F.2d 532, 540 (9th Cir. 1968)).

Under SSA regulations, the Commissioner must apply a five-step

sequential process to evaluate a disability benefits claim.[4]   The

claimant bears the burden of proof in steps one through four.

Bustamante v. Massanari, 262 F.3d 949, 953-954 (9th Cir. 2001).

The burden shifts to the Commissioner in step five.   Id. at 954.

                        ALJ'S DECISION

    At step one of the sequential process, the ALJ found that

Plaintiff had not worked since the alleged onset date of May 10,

2001. AR 12.  At step two, the ALJ found that Plaintiff had

severe impairments of bilateral carpal tunnel syndrome and

---

[4]    The five steps of the inquiry are

    1.   Is the claimant presently working in a substantially gainful
         activity?  If so, then the claimant is not disabled within
         the meaning of the Social Security Act. If not, proceed to
         step two.  See 20 C.F.R. § 416.920(b).
    2.   Is the claimant's impairment severe?  If so, proceed to step
         three.  If not, then the claimant is not disabled.  See 20
         C.F.R. § 416.920(c).
    3.   Does the impairment "meet or equal" one of a list of
         specific impairments described in 20 C.F.R. Part 220,
         Subpart P, Appendix 1?  If so, then the claimant is
         disabled.  If not, proceed to step four.  See 20 C.F.R.
         § 416.920(d).
    4.   Is the claimant able to do any work that he or she has done
         in the past?  If so, then the claimant is not disabled.  If
         not, proceed to step five.  See 20 C.F.R. § 416.920(e).
    5.   Is the claimant able to do any other work?  If so, then the
         claimant is not disabled.  If not, then the claimant is
         disabled.  See 20 C.F.R. § 416.920(f).

United States District Court
For the Northern District of California

possible pneumonia.  AR 12.  At step three, the ALJ found that
Plaintiff's impairments or combination of impairments did not meet
or medically equal one of the listed impairments described in the
regulations.  AR 12-13.

     At step four, the ALJ determined Plaintiff's residual
functional capacity (RFC) based on the medical evidence and the
intensity, persistence and limiting effects of Plaintiff's
symptoms.  AR at 13.  The ALJ found that Plaintiff had the
physical RFC to perform light work with the following
restrictions: lifting/carrying ten pounds frequently and twenty
pounds occasionally, frequently using the upper extremities for
fine and gross manipulation, no reaching above shoulder level,
occasional stooping, bending, climbing, balancing, crouching,
kneeling and crawling, and avoiding work around dust, fumes,
odors, gases and pulmonary irritants.  AR 14.  In determining
Plaintiff's RFC, the ALJ accepted that Plaintiff had carpal tunnel
syndrome discomfort related to her past assembly work and had had
little treatment in the past few years.  The ALJ noted that
Plaintiff testified at the hearing that her condition became worse
and that she needed medication, that she had trouble with elbows,
shoulders and neck, that she has not had surgery, that she has
arthritis in her knees and ankles, and that she had pneumonia
twice in one year.  AR 13.  Plaintiff also testified at the
hearing that she does housework, cooking and laundry.  AR 13, 49-
50.  The ALJ noted that Plaintiff had reported to the consultative
examiner, Dr. Fieser, that she performed independent activities of
daily living, such as showering, bathing, upper and lower
extremity dress, toileting, feeding and shopping, and household

13

1   activities such as standing at the sink and washing dishes,

2   loading the washer and dryer, vacuuming, and light dusting.  AR

3   14, 361.  The ALJ found that Plaintiff's statements about the

4   intensity, persistence and limiting effects of her symptoms were

5   not credible to the extent that they were inconsistent with the

6   RFC assessment.  AR 14.

7        The ALJ also considered opinion evidence and found that

8   Plaintiff had a history of carpal tunnel syndrome as demonstrated

9   by nerve conduction testing.  AR 14.  The ALJ noted that on June

10  11, 2001, shortly after Plaintiff stopped working, Dr. Vidaurri

11  found Plaintiff's symptoms of carpal tunnel syndrome to be "very

12  atypical."  AR 14, 443.  Dr. Vidaurri recommended conservative

13  care with bracing, ice, physical therapy and possible

14  corticosteroid injections.  AR 14, 443.  The ALJ noted that

15  Plaintiff did not attend subsequent therapy in 2002 and that she

16  declined surgery that was planned in January 2003 and scheduled

17  for February 14, 2003.  AR 14, 384.  The ALJ further noted that

18  Plaintiff resumed treatment in May 2005 with Dr. Gordon who

19  stated, "Objectively, she has a decrease in grip strength.  I

20  would consider her normal grip strength to be 50 pounds on the

21  right side and 40 on the left side."  AR 14, 601.  Dr. Gordon also

22  found that Plaintiff "has lost 35 percent of her capacity to do

23  lifting or push/pull activities and 40 percent of her capacity to

24  do repetitive gripping or repetitive manipulative activities using

25  right or left hands."  AR 601.

26       The ALJ summarized Dr. Gordon's examination as finding some

27  decrease in grip, but negative results for Tinel's and Phalen's

28  and full range of motion of the fingers.  AR 14, 597-98, 600-01.

United States District Court
For the Northern District of California

The ALJ noted that Dr. Gordon advised against surgery, citing his conclusion that "she does not have severe ongoing carpal tunnel syndrome necessitating surgery." AR 14, 601. The ALJ also noted Dr. Gordon's recommendation that Plaintiff be restricted to light exertion, lifting no more than fifteen pounds intermittently and avoiding repetitive gripping. AR 14, 601 ("Her restrictions are activities that require lifting more than 10 pounds on a repetitive basis or 15 pounds intermittently. She can do repetitive gripping or manipulative activities up to a total of approximately three hours interspersed throughout an eight-hour work shift.").

The ALJ noted that Plaintiff was seen by Dr. Fieser, the consultative examiner, on October 18, 2008, more than three years after being seen by Dr. Gordon. AR 14. Dr. Fieser found no significant tenderness to palpation over Plaintiff's right wrist, and mild tenderness to palpation over the left carpal tunnel region producing complaints of vague, nonspecific pain. AR 363. Dr. Fieser found negative Tinel's signs and Phalen's signs in both hands. AR 363. Dr. Fieser tested Plaintiff's motor strength and determined that her shoulder flexion and extension, elbow flexion and extension, wrist extension and extension, and grip strength were all 5/5 and symmetric, but did not indicate how motor strength was measured. AR 363. The ALJ summarized Dr. Fieser's findings as showing that Plaintiff had grip strength of 5/5, negative Phalen's and Tinel's, and an otherwise normal objective examination. AR 14, 364.

The ALJ noted that Dr. Fieser assigned no residual functional capacity limits, and that he had conducted Plaintiff's most recent

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

examination.  AR 14, 364.  The ALJ did not afford great weight to the earlier assessments of Drs. Gordon and Vidaurri or find that greater manipulative limitations were warranted by the objective findings in the record.  The ALJ determined that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally, could frequently use the upper extremities for fine and gross manipulation, could not reach above shoulder level, and could occasionally stoop, bend, climb, balance, crouch, kneel and crawl.  AR 14.  Due to Plaintiff's possible difficulty with breathing after being admitted for pneumonia in October 2008, the ALJ also determined that she should avoid work around dust, fumes, odors, gases and pulmonary irritants.  AR 14.

Having considered that Plaintiff had past relevant work as a housekeeper, retail sales clerk and assembler, the ALJ determined that those jobs required a higher level of exertion than allowed by Plaintiff's RFC and concluded that Plaintiff was unable to perform past relevant work.  AR 15.

At the hearing, a vocational expert (VE) testified that an individual with Plaintiff's age, education, work experience and RFC could perform the requirements of representative occupations such as product assembler and office helper, and that there are 6,000 and 2,500 such jobs, respectively, in the Bay Area.  AR 15, 91, 97.  At step five, the ALJ relied on the testimony of the VE, based on the initial set of limitations presented to her, to determine that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  AR 15-16.  The ALJ rejected additional limitations presented in hypothetical questions that adopted Dr.

Gordon's more restrictive May 11, 2005, opinion or that assumed
that Plaintiff required frequent breaks.  AR 16.  On this basis,
the ALJ found that Plaintiff was not disabled under the Act.  AR
16.

                              DISCUSSION

I.   The ALJ's Decision Is Supported by Substantial Evidence

     Plaintiff contends that the ALJ failed to call a medical
expert or make findings of limitations on Plaintiff's ability to
manipulate her hands or on her grip strength to support his
residual functional capacity determination.  Pl.'s Mot. at 11.
The ALJ relied on Dr. Fieser's consultative examination, which was
the most recent, in which he observed 5/5 grip strength,
suggesting that Plaintiff had no decreased grip strength although
Dr. Fieser did not indicate how the grip strength was measured.
Dr. Fieser also observed negative Phalen's and Tinel's, with an
otherwise normal objective examination, and assigned no residual
functional capacity limits.  AR 14.  The ALJ further states in his
findings that he did not afford "great weight to the earlier
assessments of Drs. Gordon and Vidaurri," which had been made in
2005 and 2001, respectively.

     Plaintiff contends that the ALJ improperly rejected the
opinions of her treating physicians, Drs. Gordon, Satow and
Vidaurri, who documented Plaintiff's symptoms of carpal tunnel
syndrome.  Generally, greater weight is given to a treating
physician's opinion because "he is employed to cure and has a
greater opportunity to know and observe the patient as an
individual."  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir.
1989); Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).

United States District Court
For the Northern District of California

Although the treating physician's opinion is not necessarily conclusive as to either a physical condition or the ultimate issue of disability, an ALJ must provide "specific and legitimate reasons for rejecting the opinion of the treating physician." Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983).  The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating an interpretation thereof, and making findings.  Magallanes, 881 F.2d at 751.

Here, the ALJ accepted the diagnosis of carpal tunnel syndrome discomfort.  AR 14.  However, the ALJ determined that Plaintiff's limited treatment, as evidenced in her medical records, and the more recent objective findings of the consultative examiner did not warrant the greater manipulative limitations on repetitive gripping recommended by Dr. Gordon or Dr. Vidaurri several years earlier.  AR 14.  In particular, Dr. Gordon's assessment, dated May 11, 2005, restricted Plaintiff from activities that required lifting more than ten pounds on a repetitive basis or fifteen pounds intermittently and allowed repetitive gripping or manipulative activities for no more than half an hour at a time, up to three hours interspersed throughout an eight-hour work shift.  AR 601.  As the ALJ noted, Dr. Fieser's more recent examination of Plaintiff revealed a 5/5 grip strength, although Dr. Fieser did not appear to use the same dynamometer test that Dr. Gordon used three years earlier, and negative Phalen's and Tinel's, which were consistent with Dr. Gordon's negative Phalen's and Tinel's test results in May 2005.  When examining Plaintiff in October 2008, Dr. Fieser noted Plaintiff's

history of chronic bilateral hand and wrist pain with a history of possible carpal tunnel syndrome, but found "no objective evidence on examination today." AR 364. Based on this evidence, the ALJ accepted the opinion of the consultative examiner that Plaintiff did not require manipulative limitations on her residual functional capacity.

The ALJ further found that Plaintiff's subjective statements about the intensity, persistence and limiting effects of the symptoms of her medically determinable impairments were not fully credible. AR 12. "In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis: the Cotton analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996) (citing Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)). The Cotton test is a threshold test which requires a claimant who alleges disability based on subjective symptoms to produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. Id. Once the claimant produces medical evidence of an underlying impairment, the ALJ may only reject the claimant's testimony if there is evidence that the claimant is malingering or by offering specific, clear and convincing reasons for doing so. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Soc. Sec. Ruling 96-7p (July 2, 1996). To determine a claimant's credibility regarding the severity of his or her symptoms, the ALJ may consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Smolen, 80 F.3d at 1284.

Plaintiff contends that the ALJ failed to provide clear and convincing reasons to reject her testimony, Mot. at 14-15, but the ALJ's decision articulated several reasons for discrediting her subjective testimony. Here, the ALJ noted that Plaintiff had little treatment for her carpal tunnel syndrome in the past few years and had gaps in her recent treatment by her regular physician. AR 14. The ALJ noted that Plaintiff never had carpal tunnel surgery, and her medical record shows conservative treatment, such as wrist splints worn at night and use of non-steroidal anti-inflammatory drugs, naprosen and Celebrex. These facts undermine her claims of disabling pain. See Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (favorable response to conservative treatment including physical therapy and the use of anti-inflammatory medication undermines reports of disabling pain).

The ALJ may also consider daily living activities in the credibility analysis. Burch, 400 F.3d at 680-81. The ALJ found that Plaintiff could take care of her own personal daily living needs, cook, clean, do laundry, shop, and take care of her grandson. AR 13-14. Plaintiff also stated in her function report dated December 30, 2008, that she was the sole caregiver for her mentally disabled son, making sure he is clothed and fed. AR 281. The ALJ also noted other activities, such as working part-time in

United States District Court
For the Northern District of California

2007 and 2008 and obtaining a degree from Empire College in 2007, though admittedly with help from her daughter.  AR 14, 53-59, 72-74, 254.  The ALJ found that these activities were inconsistent with Plaintiff's claims that she could not perform any work activity.  AR 14.

The ALJ further noted a physician's reference to "secondary gains" and "disability seeking," in the record dated April 24, 2008, after Plaintiff was seen for carpal tunnel syndrome and reported seeing spots before her eyes, suggesting a tendency to exaggerate.  AR 14, 346-47.  Although the ALJ did not rely on these records to support a finding of malingering, the ALJ articulated clear and convincing reasons for discrediting Plaintiff's testimony.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (tendency to exaggerate undermines credibility).

Based on the clear and convincing reasons set forth by the ALJ, supported by substantial evidence in the record, for partially rejecting Plaintiff's testimony, the ALJ properly concluded that Plaintiff's testimony regarding her symptoms was not credible to the extent it was inconsistent with the residual functional capacity that the ALJ found.

II.  Plaintiff Did Not Provide Sufficient Evidence of Medically
     Determinable Mental Impairment

A.   The ALJ Satisfied His Duty to Develop the Record

Plaintiff contends that the ALJ failed to develop a record and sufficiently evaluate her mental impairments.  In social security cases, an ALJ has the duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel.

United States District Court
For the Northern District of California

Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  One of the methods an ALJ has to develop the record is to order a CE at the SSA's expense.  Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001).  However, the burden of proving disability lies with the claimant and the ALJ's duty to develop the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation.  Mayes, 276 F.3d at 459.  The ALJ may discharge this duty in several ways including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing or keeping the record open after the hearing to allow supplementation of the record.  Tonapetyan, 242 F.3d at 1150; Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ's indication to plaintiff and her counsel that he would keep the record open so that they could supplement her doctor's report satisfied ALJ's duty to develop the record).

At the hearing before the ALJ, Plaintiff raised the possibility of ADD, a learning disorder, or other underlying mental impairment.  AR 71.  The ALJ noted that Plaintiff had reported depression at one time, citing her medical records, and Plaintiff testified to being prescribed medication for her depression.  AR 71-72, 343-359.  When asked whether she had ever seen a therapist about her depression, Plaintiff responded that she had wanted to, but hadn't done so yet.  AR 71.  At the hearing, the ALJ told Plaintiff's representative that he would keep the record open for at least twenty days so that Plaintiff could submit additional evidence.  See AR 78-79, 99.  Thus, Plaintiff had the opportunity to submit additional evidence of her

mental impairment to the ALJ, but chose not to do so.  The fact that the ALJ kept the record open after the hearing for Plaintiff to submit additional evidence is sufficient to satisfy any duty to develop the record.

Plaintiff submitted additional evidence of her mental health to the Appeals Council, including progress notes by a treating psychologist from July 20, 2010 to September 16, 2010, which were included in the administrative record.  The Appeals Council considered the additional evidence and determined that it did not provide a basis for changing the ALJ's decision.  AR 1-2.  As discussed in section II.C, below, the new evidence submitted to the Appeals Council did not show that any functional limitations were caused by Plaintiff's mental impairment.

   B.   Plaintiff Did Not Present a Colorable Claim of Mental
        Impairment to the ALJ

Plaintiff contends that the ALJ failed to follow the procedures for evaluating the severity of mental impairments required by 20 C.F.R. § 404.1520a.  When evaluating psychiatric impairments, the ALJ must follow a "special psychiatric review technique" and document the findings and conclusions in the decision.  Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).  As the Ninth Circuit has recently articulated,

> In step two of the disability determination, an ALJ must determine whether the claimant has a medically severe impairment or combination of impairments.  In making this determination, an ALJ is bound by 20 C.F.R. § 404.1520a.  That regulation requires those reviewing an application for disability to follow a special psychiatric review technique.  20 C.F.R. § 404.1520a.  Specifically, the reviewer must determine whether an applicant has a medically determinable mental impairment, id. § 404.1520a(b), rate the degree of functional limitation for four functional areas, id. § 404.1520a(c), determine the

United States District Court
For the Northern District of California

severity of the mental impairment (in part based on the degree of functional limitation), <u>id</u>. § 404.1520a(c)(1), and then, if the impairment is severe, proceed to step three of the disability analysis to determine if the impairment meets or equals a specific listed mental disorder, <u>id</u>. § 404.1520a(c)(2).

At the first two levels of review, this technique is documented in a Psychiatric Review Technique Form ("PRTF"). <u>Id</u>. § 404.1520a(e).

<u>Keyser v. Comm'r Soc. Sec. Admin.</u>, 648 F.3d 721, 725 (9th Cir. 2011).  The court noted that although the regulation had been amended so that it no longer requires the PRTF to be attached to the decision, "the Social Security Regulations require the ALJ to complete a PRTF and append it to the decision, or to incorporate its mode of analysis into the ALJ's findings and conclusions." <u>Id</u>. at 725-26 (citing <u>Gutierrez v. Apfel</u>, 199 F.3d 1048, 1050 (9th Cir. 2000), <u>superseded by regulation as stated in</u> <u>Blackmon v. Astrue</u>, 719 F. Supp. 2d 80, 92 (D.D.C. 2010)).  The court in <u>Keyser</u> held, "An ALJ's failure to comply with 20 C.F.R. § 404.1520a is not harmless if the claimant has a 'colorable claim of mental impairment.'"  <u>Id</u>. at 726 (quoting <u>Gutierrez</u>, 199 F.3d at 1051).

A colorable claim is one that is not "wholly insubstantial, immaterial, or frivolous."  <u>Udd v. Massanari</u>, 245 F.3d 1096, 1099 (9th Cir. 2001) (quoting <u>Boettcher v. Sec'y Health & Human Serv.</u>, 759 F.2d 719, 722 (9th Cir. 1985)).  The special technique under § 404.1520a requires an evaluation of the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s)."  20 C.F.R. § 404.1520a(b).  A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities

**United States District Court**
For the Northern District of California

which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508; 20 C.F.R. § 416.908; 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). On the record before the ALJ, Plaintiff presented only one report of depression or dysthymia and a prescription for prozac over a ten-year period, with no records of psychotherapy or treatment by a psychologist. AR 356. In his psychiatric review, state agency psychologist Stephen Fair determined that Plaintiff's medical records were insufficient to find a medically determinable impairment during the assessment period of May 10, 2001 to September 30, 2007. AR 480. Though offered the opportunity to supplement her records after the hearing, Plaintiff did not present the ALJ with clinical or diagnostic reports to show a colorable claim of mental impairment caused by depression. See Miles v. Astrue, 2012 WL 1605420 (C.D. Cal.) (ALJ was not required to follow special procedure where claimant failed to make colorable claim of mental impairment to the ALJ and presented scant evidence for the first time to the Appeals Council); Bowman v. Astrue, 2011 WL 3323383 (C.D. Cal.) (affirming denial of benefits where the ALJ did not receive any medical evidence of a medically determinable mental impairment).

Similarly, Plaintiff's self-report of ADD or other possible learning disability, without any supporting medical evidence, does not present a colorable claim of mental impairment. "'[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone.'" Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005) (citation omitted). See 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical

evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."). The ALJ was not, therefore, required to follow the special technique for evaluating the severity of mental impairments.

    C.  The Additional Evidence Submitted to the Appeals Council Does Not Reflect Any Functional Limitations Caused by Mental Impairment

Plaintiff contends that the new evidence provided by her treating psychologist, Dr. Steinberg, and submitted to the Appeals Council, substantiates her claim of mental impairment so as to trigger the special technique of evaluating mental impairments. The Appeals Council is not required to make any particular evidentiary finding in rejecting new evidence submitted after an adverse administrative decision. Taylor v. Comm'r Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011) (citing Gomez v. Chater, 74 F.3d 967, 972 (9th Cir. 1996)). The Court, however, considers the new evidence submitted to the Appeals Council in light of the record as a whole to determine whether the ALJ's decision was supported by substantial evidence and was free of legal error. Id. (citing Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993)). See also Brewes v. Comm'r Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th Cir. 2012) (the administrative record includes evidence submitted to and considered by the Appeals Council). Here, the additional evidence presented by Plaintiff did not show that her depression precluded her from performing suitable work or was so severe as to be disabling.

Dr. Steinberg treated Plaintiff from July 2010 to September 2010 and opined that she met the diagnostic criteria for major depression pursuant to DSM-IV. AR 617. Dr. Steinberg also stated

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

that Plaintiff's history indicated that her recurrent depression began at age twelve at the time of her father's death,[5] and that her depression was severely exacerbated a few years ago when the man with whom she was in a long-term primary relationship was deported to Mexico and not allowed to return to the United States for ten years.  AR 617.  Dr. Steinberg opined that Plaintiff's diagnostic interview substantiated the following symptoms that met the criteria for major depression: "disphoric [sic] mood and loss of interest in almost all usual activities, sleep disturbance, psychomotor agitation, loss of energy and fatigue, feelings of worthlessness, impaired concentration and indecisiveness, and recurring thoughts of death."  AR 617.

Dr. Steinberg's evaluation is vague as to the severity of Plaintiff's depression during the relevant time period, noting only that her depression was "severely exacerbated a few years ago," with notes indicating that Plaintiff had been sad and hopeless for the past four years since her partner was deported.  AR 617-18.  Even assuming that Dr. Steinberg's opinion that Plaintiff's depression covered the relevant time period of May 10, 2001 to September 30, 2007, his assessment did not opine, and Plaintiff does not contend, that her depression satisfied the required level of severity for mental disorders set forth in the listing of impairments to presume conclusively that she was disabled.  See Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir.

_____

    [5]  Elsewhere in his notes, Dr. Steinberg indicates that Plaintiff was age fifteen when her father died, AR 621, which is consistent with Plaintiff's testimony that she was in tenth grade at the time of his death, AR 69-70.

1993) ("The required level of severity for diagnosis 12.04 is met

when the claimant's impairment meets at least one paragraph A

criterion and at least two paragraph B criteria."); 20 C.F.R.

§ 404, Subpt. P, Appx. 1.[6]

---

[6] In particular, Dr. Steinberg did not conclude that
Plaintiff had any two of the requisite symptoms listed in
paragraph B. The A and B criteria for affective disorders such as
depression are defined as follows:

> A. Medically documented persistence, either continuous or
> intermittent, of one of the following:
>
> > 1. Depressive syndrome characterized by at least four of
> > the following:
> >
> > > a. Anhedonia or pervasive loss of interest in
> > > almost all activities; or
> > >
> > > b. Appetite disturbance with change in weight; or
> > >
> > > c. Sleep disturbance; or
> > >
> > > d. Psychomotor agitation or retardation; or
> > >
> > > e. Decreased energy; or
> > >
> > > f. Feelings of guilt or worthlessness; or
> > >
> > > g. Difficulty concentrating or thinking; or
> > >
> > > h. Thoughts of suicide; or
> > >
> > > i. Hallucinations, delusions, or paranoid thinking;
> > > or
> >
> > 2. Manic syndrome characterized by at least three of the
> > [listed symptoms]; or
> >
> > 3. Bipolar syndrome with a history of episodic periods
> > manifested by the full symptomatic picture of both manic
> > and depressive syndromes (and currently characterized by
> > either or both syndromes);
>
> AND
>
> B. Resulting in at least two of the following:
>
> > 1. Marked restriction of activities of daily living; or

United States District Court
For the Northern District of California

1    Nor did Dr. Steinberg attribute any functional limitation to

2    Plaintiff's depression.  Although Dr. Steinberg noted that

3    Plaintiff exhibited "loss of interest in almost all usual

4    activities," AR 617, he did not opine that she was unable or

5    limited in her ability to perform daily living activities, and her

6    testimony at the hearing indicated that she did actually perform

7    daily activities independently, AR 14, 361.  Thus, even if the ALJ

8    erred in failing to evaluate Plaintiff's claim of mental

9    impairment under the special technique, any such error was

10   harmless because Plaintiff failed to show that her depression

11   resulted in functional loss in the four areas of function set out

12   in the special technique: (a) activities of daily living;

13   (b) social functioning; (c) concentration, persistence, or pace;

14   and (d) episodes of decompensation.  <u>Chaudry</u>, 688 F.3d at 666-67;

15   20 C.F.R. § 416.920a(c)(3).  <u>Cf</u>. <u>Gatson v. Astrue</u>, 2011 WL 3818494

16   (C.D. Cal.) (remanding for supplemental evaluation of mental

17

18       2. Marked difficulties in maintaining social
         functioning; or

19

20       3. Marked difficulties in maintaining concentration,
         persistence, or pace; or

21

22       4. Repeated episodes of decompensation, each of extended
         duration;

23       If the paragraph B criteria are not satisfied, the paragraph
     C criteria allows for a claimant to meet the listing for affective

24   disorders if there is "[m]edically documented history of a chronic
     affective disorder of at least 2 years' duration that has caused

25   more than a minimal limitation of ability to do basic work
     activities, with symptoms or signs currently attenuated by

26   medication or psychosocial support, and one of the [listed
     factors]."

27

28

impairment evidence where the claimant presented extensive mental
health treatment records predating the ALJ's decision and
documenting "moderate limitations to understand and remember
detailed instructions" and "marked limitations in social
interactions").

The ALJ's determination that Plaintiff was not disabled under
the Act is supported by substantial evidence in the record. See
Allen v. Sec. Health & Human Serv., 726 F.2d 1470, 1473 (9th Cir.
1984) (psychiatric evidence "shows primarily that a disorder
exists [but] does not show that it was of disabling severity").
Even after having the opportunity to supplement her medical
records, Plaintiff did not demonstrate that she had a medically
determinable mental impairment that prevented her from engaging in
substantial gainful employment. Reddick v. Chater, 157 F.3d 715,
721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).

III. Remand Is Not Warranted

Plaintiff seeks remand of her application for disability
benefits to the ALJ for consideration of new evidence or for award
of benefits without rehearing. Pl.'s Mot. at 1-2. Plaintiff
fails to demonstrate either basis for remand.

When seeking remand for consideration of new evidence
submitted after the Commissioner's final decision has been made, a
plaintiff "must show that there is: (1) new evidence that is
material, and (2) good cause for his failure to incorporate that
evidence into the administrative record." Sanchez v. Sec. Health
& Human Serv., 812 F.2d 509, 511 (9th Cir. 1987) (citing Allen,
726 F.2d at 1473 and 42 U.S.C. § 405(g)). "A claimant does not
meet the good cause requirement by merely obtaining a more

1   favorable report once his or her claim has been denied." <u>Mayes v.</u>

2   <u>Massanari</u>, 276 F.3d 453, 463 (9th Cir. 2001).  New reports made

3   after issuance of the Commissioner's final decision "would be

4   material to a new application, but not probative of [the

5   plaintiff's] condition at the hearing." <u>Sanchez</u>, 812 F.2d at 512.

6       Plaintiff has submitted new medical records of treatment for

7   her pneumonia and/or a lung impairment dated between August 17,

8   2011 and October 19, 2011.  Pl.'s Notice of New and Material

9   Evidence (Docket No. 14).  These records are not material to

10  Plaintiff's condition as it existed at the time of the hearing and

11  do not satisfy the applicable standard for remand for

12  consideration of new evidence.  <u>Sanchez</u>, 812 F.2d at 512.

13  Furthermore, Plaintiff has not demonstrated that the record

14  supports an award of benefits.  <u>Cf</u>. <u>Brewes</u>, 682 F.3d at 1164 ("'We

15  may direct an award of benefits where the record has been fully

16  developed and where further administrative proceedings would serve

17  no useful purpose.'") (quoting <u>Smolen</u>, 80 F.3d at 1292).

18  Plaintiff's motion for remand is therefore denied.

19                          CONCLUSION

20      Based on the foregoing, Defendant's cross-motion for summary

21  judgment is granted and Plaintiff's motion for summary judgment or

22  \\

23  \\

24  \\

25

26

27

28

1  for remand is denied.  Judgment shall enter accordingly.  The

2  parties shall bear their own costs.

3

4       IT IS SO ORDERED.

5

6  Dated: 9/26/2012



CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California